

www.millerlaw.nyc            **Meredith R. Miller, Esq.**

**Miller Law, PLLC**
167 Madison Avenue, Suite 503
New York, NY 10016

**Tel:** (347) 878-2587
**Fax:** (866) 495-6719
meredith@millerlaw.nyc

December 23, 2022

<u>**VIA ECF**</u>
Honorable Ramon E. Reyes, Jr.
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East, Rm. N208
Brooklyn, New York 11201

    Re:    <u>**Ana Liz et al. v. 5 Tellers Associates, L.P. et al.**</u>
             <u>**Case No. 1:20-cv-00212 (RER)**</u>

Dear Judge Reyes:

We represent the two named plaintiffs, Ana Liz ("A. Liz" or "Ms. Liz") and Waly Ferreira ("W. Ferreira") (the "Named Plaintiffs"), and six opt-in plaintiffs, Francisco Liz ("F. Liz" or "Mr. Liz"), Jonny Bonilla ("Bonilla"), Mario Villanueva ("Villanueva"), Jose Nicolas Blanco ("Blanco"), Jose Hernandez ("Hernandez") and Ramon Ferreira ("R. Ferreira") (the "Opt-In Plaintiffs")[1] in the above-referenced matter, which involves claims under the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA") and New York Labor Law ("NYLL") for wage and hour violations.

As more fully explained below, Plaintiffs are building employees who claim they were employed by one or more of defendants 5 Tellers Associates, L.P., 5 Tellers Housing Development Fund Company, Inc., Parkview Apartments, LLC, John Volandes, and Peter Volandes (the "5 Tellers Defendants") and Property Management Group, Inc. ("PMG") (together, PMG and 5 Tellers Defendants are referred to collectively as "Defendants"). Plaintiffs write jointly with Defendants to request that the Court approve the settlement agreement (the "Agreement") reached by the parties as a fair and reasonable resolution of this matter. On May 31, 2022, the parties participated in a day-long, in-person private mediation facilitated by the Honorable Steven M. Gold (Ret.) and made substantial progress towards a settlement. On June 2, 2022, the parties reached an amicable resolution of the claims set forth in Plaintiffs' complaint. Thereafter, the parties drafted and extensively negotiated, over a period of approximately six months, the terms of the Agreement, a fully executed copy of which is annexed hereto as Exhibit 1. The Agreement reflects a desire by all parties to fully and finally settle Plaintiffs' FLSA and NYLL claims.

Plaintiffs' counsel further requests that the Court approve our attorneys' fees and costs.

**I.**     **Introduction.**

As Plaintiffs' claims arise, in part, under the FLSA, the Agreement must be approved by this Court. *See Cheeks v. Freeport Pancake House, Inc.*, 796 F. 3d 199 (2d Cir. 2015). In

---
[1] Collectively, the Named Plaintiffs and the Opt-In Plaintiffs are referred to herein as "Plaintiffs."

evaluating whether a proposed settlement is fair and reasonable, "a court should consider the totality of circumstances including, but not limited to, the following factors: (1) the plaintiff's range of possible recovery; (2) the extent to which the settlement will enable the parties to avoid anticipated burdens and expenses in establishing their respective claims and defenses; (3) the seriousness of the litigation risks faced by the parties; (4) whether the settlement agreement is the product of arm's-length bargaining between experienced counsel; and (5) the possibility of fraud or collusion." *Wolinsky v. Scholastic Inc.*, 900 F. Supp. 2d 332, 335-336, (S.D.N.Y. 2012) (citations and quotation marks omitted).

## II. Background and Procedural History.

### A. *The Parties, Pleadings and Conditional Certification Order.*

The 5 Tellers Defendants own and control certain apartment buildings in the Bronx (the "5 Tellers Buildings"). At only certain times relevant to Plaintiffs' claims, PMG managed the 5 Tellers Buildings. The Named Plaintiffs and three of the Opt-In Plaintiffs (namely, Mr. Liz, Bonilla and Villanueva) worked at 5 Tellers Buildings (with the exception of Ana Liz, which is disputed). The remaining Opt-In Plaintiffs (Blanco, R. Ferreira and Hernandez) were superintendents of buildings that were not owned by the 5 Tellers Defendants.[2]

Named Plaintiffs commenced this case with their filing of a collective action complaint on January 10, 2020 (the "Complaint") [dkt. #1], seeking relief for alleged violations of the minimum wage and overtime provisions of the FLSA and NYLL, as well as the wage notice and wage statement provisions of the NYLL and its supporting regulations. The 5 Tellers Defendants and PMG asserted crossclaims against each other.

The parties participated in a Court-referred mediation on July 16, 2020, but were unable to agree upon a resolution. On November 9, 2020, after the Court-referred mediation failed, Plaintiffs moved, pursuant to 29 U.S.C. § 216(b), for an order granting conditional certification of a collective action solely as to defendant PMG. Specifically, Plaintiffs requested authorization to distribute notices to superintendents who worked at buildings managed by PMG since January 10, 2017. In a decision and order dated April 1, 2021, Your Honor conditionally certified a collective consisting of superintendents who worked at PMG-managed buildings in the Bronx [dkt. #53]. Notice was distributed in accordance with that order.

### B. *Plaintiffs' Contemplated Motion to Amend the Complaint.*

---

[2] Plaintiffs argued that PMG jointly employed all Plaintiffs, while the 5 Tellers Defendants jointly employed only those five Plaintiffs who worked at one or more of the 5 Tellers Buildings. In addition, the 5 Tellers Defendants argued that PMG jointly employed all the Plaintiffs who worked at the 5 Tellers Buildings and alleged, among other things, that PMG hired certain of those Plaintiffs, supervised them, set and controlled their work schedules, and maintained records concerning their employment, work activities and wages. In response, PMG argued that it did not jointly employ any of the Plaintiffs, that the 5 Tellers Defendants were solely liable for the wage claims of Plaintiffs who worked at the 5 Tellers Buildings, as stated in the management agreement between them, and that the owners of the other buildings at which Blanco and Hernandez worked were solely liable for their wage claims and were thus necessary parties to this case.

At the time the action was commenced, all of the Plaintiffs had already ceased working for Defendants except Blanco, who continued to work as a superintendent until May 2022. On January 4, 2022 [dkt. #85], Plaintiffs filed a pre-motion letter outlining their anticipated motion for leave to amend the Complaint to: (a) add a new cause of action for retaliation on behalf of Blanco against PMG; its president, Victor Owen ("Owen"); and one of its employees, Pan Xin ("Xin"); and (b) add Owen and Xin, individually, as defendants, based on Plaintiffs' intended argument that both of them had joint employer status. The Court set a briefing schedule for Plaintiffs' motion for leave to amend, which, at the Parties' joint request, was adjourned because the parties decided to again attempt to settle Plaintiffs' claims and Defendants' cross-claims, this time through private mediation.

### C. Discovery.

Though there were still lingering disputes about what should be produced and the sufficiency of the parties' productions, the parties did exchange document discovery. Plaintiffs produced more than 1100 pages of document discovery; collectively, the 5 Tellers Defendants and PMG produced approximately 1500 pages of document discovery. Additionally, Plaintiffs responded to interrogatories interposed by PMG, and the 5 Tellers Defendants and PMG each responded to interrogatories interposed by Plaintiffs. The parties had agreed to a robust deposition schedule which provided for two depositions per week in February and March 2022. After the first scheduled deposition took place (namely, that of Blanco, which lasted two days), all counsel agreed to another attempt at settling by participating in private mediation.

### D. May 2022 Mediation Facilitated by the Honorable Steven Gold (Ret.).

The parties engaged in a day-long, in-person mediation session at JAMS on May 31, 2022, which included arms' length negotiations that were overseen by a mediator, Honorable Steven Gold (Ret.). At the mediation, the parties engaged in extensive discussions regarding liability, damage calculations and the risks and burdens of continued litigation and made substantial progress towards a settlement. On June 2, 2022, the parties reached an agreement in principle, but, given the contentious nature of the matter, and the complications of having two factions of defendants (5 Tellers Defendants on the one hand, and PMG on the other), finalizing the details of the Agreement took over six more months of ongoing negotiation.

All Plaintiffs participated in the mediation session in person and a Spanish language interpreter was present for the entire session.

### III. Summary of Plaintiffs' Wage and Hour, Wage Notice and Wage Statement Allegations; Summary of Defendants' Defenses.

#### A. Plaintiffs' Summary:

Plaintiffs allege that, among other tasks, they handled cleaning, repairing apartments and common areas; flooring; changing doors; plumbing; lighting; snow removal; light plumbing, including fixing leaks; apartment turnovers; garbage and recycling; responding to tenant

requests; resolving violations issued by NYC agencies; and being on call to handle emergent issues. Plaintiffs allege that tenants were given the superintendents' cellular telephone numbers.

Plaintiffs allege that, regardless of how many hours they worked, each Plaintiff was paid a flat weekly salary. The sole exception to this is Ms. Liz. Plaintiffs allege that Ms. Liz was unlawfully paid no wages despite having worked an average of 22 hours per week assisting her husband, Francisco Liz, in maintaining the buildings located at 300 and 304 East 162nd Street in the Bronx. Therefore, Plaintiffs allege that Ms. Liz is owed compensation for all hours she worked at minimum wage rates applicable to large employers in New York City that were in effect during the six years preceding the commencement of this lawsuit.

Ms. Liz faces some risk of a trier of fact concluding that she was not Defendants' employee. In at least two prior cases, judges in this District have addressed the question of when a superintendent family member qualifies as an employee based on work they performed without pay. The test articulated is fact-intensive. In *Draskovic v. Oneota Assocs., LLC*, No. 1:17-CV-5085 (ARR) (JO), 2019 U.S. Dist. LEXIS 28017, at *26 (E.D.N.Y. Feb. 21, 2019), which canvassed relevant decisions, the court held that there was an issue of fact regarding whether a superintendent's wife was employed by defendants. The court based its holding, in part, on plaintiffs' contention that her husband could not have performed these duties because "he was simultaneously occupied performing other work for the defendants." *Id.* On this basis, the court held that the circumstances were distinguishable from those in *Figurowski v. Marbil Inv'rs, LLC*, No. 14-CV-7032(JS)(AKT), 2018 U.S. Dist. LEXIS 54756, at *27 (E.D.N.Y. Mar. 30, 2018), where the court held that a superintendent's wife was not defendants' employee, despite having assisted her husband with his duties. In light of the foregoing, although Plaintiffs are confident in the merits of Ms. Liz' claims, Plaintiffs cannot completely dismiss the possibility that Ms. Liz' claims may fall short.

The bulk of the other Plaintiffs' damages are based on the alleged failure of Defendants to pay them premium overtime compensation (at 1.5 times their effective, regular rates of pay) for all hours of work above the first forty per week. Plaintiffs' calculation of their estimated overtime damages is based on the rebuttable presumption in the Second Circuit that a fixed salary covers 40 hours. *See, e.g., Perez v. Platinum Plaza 400 Cleaners, Inc.,* No. 12-cv-9353, 2015 U.S. Dist. LEXIS 54066, *6-7 (S.D.N.Y. Apr. 24, 2015); *Keun-Jae Moon v. Gab Kwon,* 248 F. Supp. 2d 201, 207 (S.D.N.Y. 2002); *Giles v. City of New York,* 41 F. Supp. 2d 308, 316-217 (S.D.N.Y. 1999). In the unlikely event that Defendants were to overcome the foregoing presumption, Plaintiffs' potential overtime damages would be lower.

Plaintiffs allege that they worked at the following buildings at the following rates of pay and estimated hours per week, not including time spent on call and/or handling emergencies:

1. **Ana Liz**, 300/304 East 162nd Street, Bronx, 42 units (May 2003 - Nov. 2019) (5 Tellers Building managed by PMG)
   - Average 22 hrs/week; Not paid any compensation whatsoever

2. **Francisco Liz**, 300/304 East 162nd Street, Bronx, 42 units (May 2003 - Nov. 2019) (5 Tellers Building managed by PMG)
   - Average 55 hrs/week; Flat weekly salary of $300

3. **Waly Ferreira**, 1660 Crotona Park East, Bronx, 67 units (Jul. 2012 - Nov. 2019) (5 Tellers Building managed by PMG)
   - Average 60.5 hrs/week; Flat weekly salary of $560

4. **Jonny Bonilla**, 1680 Crotona Park East, Bronx, 62 units (2009 - Nov. 2019) (5 Tellers Building managed by PMG)
   - Average 55 hrs/week; Flat weekly salary of $560

5. **Mario Villanueva**, 819, 821 and 823 East 173rd Street, Bronx, 72 units (Jun. 2006 - Feb. 2020) (5 Tellers Building managed by PMG)
   - Average 55.5 hrs/week; Flat weekly salary of $560

6. **Jose Nicolas Blanco**, 1392 Boston Road, 1238 and 1190 Franklin Avenue, Bronx, 67 units (approx. 2005 – May 2022) (PMG-managed building not owned by 5 Tellers Defendants)
   - Average 52 hrs/week; Flat weekly salary of $360, increasing in 2020 to $500

7. **Jose Hernandez**, 1422 Nelson Avenue, Bronx, 72 units (2006 - 2019) (PMG-managed building not owned by 5 Tellers Defendants)
   - Average 82 hrs/week; Flat weekly salary of $550

8. **Ramon Ferreira**, 2734 Sedgwick Avenue, 58 units (2001 - Jan. 2018) (PMG-managed building not owned by 5 Tellers Defendants)
   - Average 63 hrs/week; Flat weekly salary of $560

Plaintiffs had assigned the combined, best-case estimate of $1,028,885.50 to their FLSA and NYLL minimum wage and overtime claims. This sum was exclusive of liquidated damages, statutory wage notice/statement damages, statutory interest, and legal fees/costs. Plaintiffs provided a detailed, week-by-week chart of their foregoing damages estimates to Defendants, as well as to Judge Gold, in advance of the mediation. Plaintiffs' charts covered the entire, six-year NYLL limitations period.

After extensive discussions, at Judge Gold's request, Plaintiffs prepared revised damages spreadsheets containing calculations of their respective overtime damages solely for the FLSA's three-year limitations period, rather than six years under the NYLL. Those revised spreadsheets, which were shared with Defendants and Judge Gold, are attached hereto as Exhibit 2.

As detailed in these spreadsheets, Plaintiffs estimated that Ms. Liz' minimum wage claim had a potential value of $71,346.00. Regarding the other seven Plaintiffs, Plaintiffs estimated that the FLSA minimum wage and/or overtime damages, exclusive of liquidated damages and statutory interest, were:

1. **Francisco Liz**: $24,637.50
2. **Waly Ferreira**: $63,283.50
3. **Jonny Bonilla**: $45,990.00
4. **Mario Villanueva**: $50,778.00
5. **Jose Nicolas Blanco**: $25,767.00
6. **Jose Hernandez**: $13,860.00
7. **Ramon Ferreira**: $3,864.00

The foregoing amounts do not include liquidated damages or statutory interest. If this matter were to proceed to trial, the possibility of liquidated damages and the likelihood of pre-judgment interest could substantially increase the amount of damages.

In addition, Plaintiffs alleged that wage notice and statement violations under the NYLL total approximately $100,000.00.

Plaintiffs understand that they would each face challenges if their claims were to proceed to trial, including the task of establishing the number of hours they worked largely on the basis of their own testimony. There are few, if any, contemporaneous written records of hours worked. To the extent that are any electronic and/or written materials relating to the number of hours worked, these consist of text messages and similar types of communications.

In addition, with respect to Ms. Liz, Defendants aver that they were unaware that she had performed any work at 300/304 East 162nd in the Bronx. On this basis, Defendants argue that Ms. Liz never had the status of Defendants' employee.

The other Plaintiffs face the risk that Defendants might succeed in establishing their affirmative defense arguing that Plaintiffs are exempt from overtime under the NYLL's "janitor exemption."

### B. *Defendants' Summary of Defenses:*

<u>Plaintiffs Did Not Work in Excess of 40 Hours</u>

Defendants maintain that all Plaintiffs grossly overstate their claimed hours worked throughout their employment, that they never worked over 40 hours in a week (and typically, much less) and that they were paid for all the hours worked. Defendants contend that Plaintiffs are unlikely to establish their claimed overtime hours and that, while certain contemporaneous time records are unavailable, the Defendants intended to submit other evidence establishing that Plaintiffs did not work (and could not have worked) more than 40 hours, including affidavits from persons with first-hand knowledge of Plaintiffs' unavailability and absences during their work hours.

*The Janitorial Exemption*

Defendants also maintain that Plaintiffs' overtime claims are precluded by the NYLL exemption pursuant to 12 NYCRR Part 141-3.4 (commonly known as the "janitor exemption"). The janitor exemption allows employers in the building service industry to designate one of its employees who lives in the building as the "janitor." However, in buildings that employ just one employee (which was the case in all of the buildings at which Plaintiffs were employed), Defendants argue that the sole employee is automatically deemed the "janitor". Defendants accordingly maintain that the Plaintiffs fall within the janitorial exemption, as each of them were the sole employees at their respective buildings, employed as live-in superintendents/janitors. Indeed, as part of their compensation, in addition to their weekly salaries, each of the Plaintiffs were provided a free two-bedroom apartment, free utilities, a phone allowance, two weeks' paid vacation and a Christmas bonus. The foregoing does not apply to Ms. Liz, who the Defendants maintain was never employed.

Specifically, pursuant to the Building Services Wage Order and well-established case law, the regulations "do not provide for either minimum wages or overtime wages for "janitors," who are instead paid based on the number of units in the building in which they worked. 12 N.Y.C.R.R. § 141-1.4; *see Niemiec v. Ann Bendick Realty*, 2007 WL 5157027, at *4 n. 6 (E.D.N.Y. Apr. 23, 2007); *Koljenovic v. Marx*, 999 F. Supp. 2d 396, 399 (E.D.N.Y. Feb. 6, 2014) (holding building superintendents were exempt from New York Labor law minimum and overtime wage requirements under the janitor exemption). "Instead of requiring an hourly minimum wage and overtime premium, New York requires employers in the building service industry to pay janitors in residential buildings a weekly minimum based on the number of units in the buildings, subject to a cap." *Llolla v. Karen Gardens Apartment Corp.*, 2014 WL 1310311, at *10 (E.D.N.Y. Mar. 10, 2014) (citing 12 N.Y.C.R.R. §§ 141-1.2, -2.8), *adopted in relevant part by* 2014 WL 1311733 (E.D.N.Y. Mar. 28, 2014); *Draskovic v. Oneota Associates, LLC*, 2019 WL 783033, at *14 (Feb. 21, 2019) (same). Under this exemption, the janitor must only receive a weekly minimum, which is set forth in the applicable wage order and is based either on the number of units in the building or a minimum set by the New York State Department of Labor. The janitor is also exempt from the overtime requirements set forth in the NYLL.

Based on Defendants' calculations for each Plaintiff (except for Ms. Liz), Plaintiffs were paid at, or above, the weekly minimum in the applicable wage order and thus have no minimum wage or overtime claim under the NYLL. Further, if the janitor exemption applies, as Defendants maintain, Plaintiffs are only able to pursue claims for overtime under the FLSA, which reduces the statute of limitations by at least half (but can be reduced by up to two-thirds, if Defendants successfully demonstrate that any FLSA violation was not willful).

As to Ms. Liz, Defendants deny they ever employed her. If Mr. Liz enlisted Ms. Liz to assist him, Defendants claim they were unaware and never requested Ms. Liz to work. Defendants argue that any work allegedly performed by Ms. Liz was performed voluntarily, unknown to Defendants, and not under the direction and control of Defendants, but at the request of Mr. Liz.

Defendants deny wage violations and contend that if there were any such violations, they would not warrant liquidated damages because Defendants believed in good faith that they were in compliance with the law.

*Joint Employer Status*

Further, PMG denies that it is a joint employer of any of the Plaintiffs and that PMG solely provided "back office" services for the 5 Tellers Defendants. It has long been settled that courts must utilize the "economic reality" test to determine whether an employment relationship exists for purposes of the FLSA. Several factors are considered, including: (a) whether the alleged employer had the power to hire and fire the employees; (b) supervised and controlled employee work schedules or conditions of employment; (c) determined the rate and method of payment; and (d) maintain employment records. *Moses v. Griffin Indus.*, LLC, 2019 U.S.Dist.LEXIS 74186 (S.D.N.Y. 2019); *Ibarra v. W&L Grp. Constr., Inc.*, 2019 U.S.Dist.LEXIS 195175 (E.D.N.Y. 2019).

The Second Circuit also applies a six-part test to determine whether an entity has "functional control" over the employee in the absence of formal control, in determining whether that entity is his employer. *Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61 (2d Cir. 2003). The relevant factors include:

> (1) whether the purported joint employer's premises and equipment were used for the plaintiff's work; (2) whether plaintiff worked for an organization that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiff performed a discrete line job that was integral to the purported joint employer's process of production; (4) whether responsibility under the contracts could pass from one purported joint employer to another without material changes; (5) the degree to which the purported joint employer supervised plaintiff's work; and (6) whether plaintiff worked exclusively or predominantly for the purported joint employer.

*Id.* at *42-43.

Moreover, for an employee to demonstrate that he worked, and is thus entitled to be paid straight or overtime, he must demonstrate that he engaged in "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily **for the benefit of the employer and his business.**" *Holzapfel v. Town of Newburgh*, 145 F.3d 516 (2d Cir. 1998) (*emphasis added*).

At bar, PMG maintains that it did not exercise joint control and decision-making power over the terms and conditions of Plaintiffs' employment, including setting their wages and their employment policies and practices. Specifically, against the "economic reality" test factors, PMG maintains that it was not and cannot be considered a joint employer. For one, PMG maintains that it had no independent power to hire or fire any of the Plaintiffs.[3] The Plaintiffs

---

[3] While this section largely addresses the joint employer status issue among PMG and the 5 Tellers Defendants, the same arguments would have been raised regarding the non-5 Tellers Plaintiff and the owners of those respective buildings, had the case not been resolved.

who worked at the 5 Tellers Buildings were all hired directly by and were paid the wages agreed upon by the 5 Tellers Defendants.

Moreover, PMG maintains that the terms of the Plaintiffs' employment, including the need to be available for large portions of the day not only is an essential function of a live-in janitor/superintendent's duties but was a requirement set by the 5 Tellers Defendants with respect to the 5 Tellers Buildings, not PMG, as it was in their interest to ensure that their buildings were being looked after and taken care of, not PMG's.

PMG further maintains that the 5 Tellers Defendants have acknowledged that with respect to the Plaintiffs who worked at the 5 Tellers Buildings, regarding payment of wages, the wages came from their own bank accounts and that PMG was only involved in the ministerial task of cutting the checks each week (as agents typically do for their principals). And indeed, PMG maintains that it had no authority to make such financial decisions on 5 Tellers' behalf and further, that Plaintiffs who worked in the 5 Tellers Buildings remained employed by the 5 Tellers Defendants after its relationship with PMG ended.

Finally in this respect, PMG maintains that significant documentary evidence exists which demonstrates that it did not jointly employ the Plaintiffs who worked in the 5 Tellers Buildings with the 5 Tellers Defendants, including: (a) the management agreements between them which state that all employees are solely within the employ of the 5 Tellers Defendants and that PMG is not responsible for their wages; (b) letters which illustrate that the 5 Tellers Defendants both hired and fired their employees and set their schedules and pay rate and then notified PMG of these decisions; (c) paychecks issued to the Plaintiffs reflecting that the 5 Tellers Defendants paid them; (d) the 5 Tellers Defendants' tax returns reflecting that they employed the Plaintiff and that their salaries were paid by the 5 Tellers Defendants; and (e) documents which reflect that the apartments that the Plaintiffs lived in were owned by the 5 Tellers Defendants.

Even if the Court would have considered the "functional control" test instead, PMG maintains that the Plaintiffs could not overcome the threshold issue that they did not perform any work for the benefit of PMG as all work benefitted the 5 Tellers Defendants, in light of the following: (a) Plaintiffs did not perform back office administrative tasks and they never worked at PMG's premises (nor did they use PMG's equipment for their work); (b) Plaintiffs' responsibilities were not integral to PMG's operations; (c) the 5 Tellers Defendants and PMG have entirely distinct ownership, operations and their respective operations could not be shifted on to the other (*i.e.* PMG's property management responsibilities could not be shifted to the 5 Tellers Defendants and vice versa); and (d) PMG did not supervise the Plaintiffs' work.

### *The Statute of Limitations*

PMG maintains that the claims asserted by some of the opt-in Plaintiffs' claims are largely time barred (when considering the janitorial exemption and that the FLSA's limitations period is, at most, three years). Specifically, Hernandez' opt-in date was May 2021, the limitations period extends back to May 2018. *Enriquez v. Cherry Hill Market Corp.*, No. 10 Civ. 5616, 2012 U.S. Dist. LEXIS 17036, at *7 (E.D.N.Y. Feb. 10, 2012) (holding that the three-year

statute of limitations generally isn't tolled until the day an employee opts into a suit; *Hoffmann v. Sbarro, Inc.*, 982 F.Supp. 249, 260 (S.D.N.Y. 1997) (same).

However, PMG stopped managing the building at which Hernandez was employed in February 2018. In other words, PMG stopped managing the building outside of the limitations period for Hernandez' claim and so PMG maintains that Hernandez has no claim against PMG (whether for minimum wage, overtime or any other purported wage violation).

A similar situation exists for Ramon Ferreira. As Ferreira's opt-in date was January 2021, the FLSA limitations period extends back to January 2018. However, PMG stopped managing the building for which Ferreira was employed in December 2017. Therefore, PMG maintains that Ferreira has no claim against PMG (whether for minimum wage, overtime or any other purported wage violation), as PMG's dealings with Ferreira fall outside of the applicable statute of limitations (even assuming a 3-year limitations, as opposed to a two-year limitations period).

Finally, as for Blanco (just as for all of the remaining Plaintiffs), Blanco's claimed damages extend back to 2014; however, the three-year limitations period - - running from his opt-in date of January 2021 - - extends back only to January 2018. In light of this, PMG maintains that all of Blanco's (and the other Plaintiffs') alleged damages for 2014 through December 2017 are not recoverable.

### IV. Blanco's Remaining Claims.

*Plaintiffs' Position:*

Blanco worked for PMG for approximately sixteen years, until just weeks before the mediation in May 2022. Thus, when Blanco joined this case, he was still working as a superintendent for PMG. Blanco alleges that, after joining the case, he endured retaliation by PMG. Blanco believes that the two declarations he submitted to this Court, dated January 19, 2021 and December 30, 2021, respectively (dkts. # 48 and 85-1), amply detail the retaliation he claims he suffered. These potential claims were explored to some degree in his deposition. Blanco was the only Plaintiff in this action that sat for a deposition before discovery was stayed pending the mediation with Judge Gold.

At the time of the mediation, Plaintiffs had not yet briefed their motion for leave to amend the Complaint, which would have added Blanco's claim for retaliation. As of the mediation, Plaintiffs did not yet attempt to quantify Blanco's proposed claim.

Further, because Blanco was the only Plaintiff still employed by any of the Defendants during this litigation, his situation presented other issues unique to him concerning his right to continue occupying his apartment. PMG demanded that Blanco immediately vacate the apartment it provided to him in connection with his employment. At the mediation, PMG and Blanco negotiated the timetable and other terms relating to Blanco's relinquishment of his apartment.

Blanco denies PMG's allegations that he occupied vacant apartments or partitioned and rented rooms.

The Agreement reflects additional payments to Blanco for a general release of PMG, which includes these additional claims.

### *PMG's Defenses:*

Blanco claimed that he was retaliated against after he opted into this case. Specifically, that after opting in on January 20, 2021, PMG took certain retaliatory actions against him, including purportedly ending payments for Blanco's ConEd bill for his apartment. PMG maintains that the the ConEd bills unequivocally demonstrate that PMG redirected the bills to Blanco's apartment, to be paid by him, many months *before* he joined this suit; specifically, the bills demonstrate that as of September 2020, PMG changed the account so that ConEd would stop sending the bills to its office (at: 3154 Albany Cr., #2Fl, Bronx, NY 10463) so that they were instead sent to Blanco's apartment: 1392 Boston Road BSMT, Bronx, New York 10456. This occurred more than three months *before* Blanco opted in.

Blanco also claimed, through this declaration, that PMG retaliated against him by installing cameras "in his hallway". PMG maintains that, in reality, the *entire* building was equipped with cameras on every floor. Moreover, this particular camera was installed in the basement *entrance* hallway (approximately 15-20 feet away from the entrance to Blanco's apartment, which is also in the basement).

Not only does PMG maintain that the intended retaliation claim was baseless and would have been dismissed based on the documentary evidence already in hand, but the general release exchanged between PMG and Blanco (and particularly, the general release being given to Blanco) is just as valuable (if not more) than the additional monetary payment being made to him, given PMG's potential claims against Blanco. PMG alleges that Blanco surreptitiously occupied vacated units in the buildings at which Blanco worked and lived, allegedly constructed illegal partitions and then rented out those partitioned rooms, and was terminated.

### V.     Summary of the Settlement Agreement.

*A. Summary of Material Terms.*

PMG and the 5 Tellers Defendants have agreed to pay Plaintiffs the total sum of $451,500.00 (as apportioned between the Defendants in the accompanying Settlement Agreement) to fully and finally resolve all claims raised in the litigation. In exchange, all Plaintiffs except for Blanco have provided a limited release of any wage and hour claims they could have raised in this litigation. As between PMG and Blanco, the parties have agreed to a mutual general release to account for his additional claims.

B. *Allocation of Settlement Proceeds among Plaintiffs.*

As more fully explained below, expenses and attorneys' fees total $155,719.34. The Plaintiffs agreed to allocate the remaining $295,780.66 in settlement proceeds among them as follows:

| F. Liz | $31,243.37 |
| W. Ferreira | $71,801.30 |
| J. Bonilla | $52,715.21 |
| M. Villanueva | $57,486.73 |
| J. Blanco | $37,743.37 |
| J. Hernandez | $19,314.56 |
| R. Ferreira | $9,771.52 |
| A. Liz | $15,704.60 |

The allocation was calculated by subtracting expenses of $10,036.33 and attorneys' fees of $145,683.01, to yield a net settlement amount of $295,780.66. From that, Plaintiffs subtracted the $6,500.00 payment to Blanco related to his retaliation claim ($5,000.00) and a payment to incentivize him to vacate his apartment ($1,500.00). That yielded $289,280.66. From that amount, each Plaintiff was provided with $5,000.00 for wage statement/notice damages ($5,000.00 x 8 = $40,000). That left $249,800.66. From that amount, Plaintiffs allocated $10,704.60 to Ms. Liz, which is approximately 15% of her estimated minimum wage damages. That left $238,576.06, which was allocated among the remaining seven Plaintiffs based on their percentage of the sum total of all FLSA damage estimates for those seven Plaintiffs. The percentages and estimated damages for those seven Plaintiffs were:

| F. Liz | 11% | $26,243.37 |
| W. Ferreira | 28% | $66,801.30 |
| J. Bonilla | 20% | $47,715.21 |
| M. Villanueva | 22% | $52,486.73 |
| J. Blanco | 11% | $26,243.37 |
| J. Hernandez | 6% | $14,314.56 |
| R. Ferreira | 2% | $4,771.52 |

Plaintiffs have discussed and agreed to this allocation. Plaintiffs' counsel has explained to each of the Plaintiffs the basis for the apportionment of the settlement amount. This issue was

discussed in depth at the mediation, and in subsequent in-person meetings. At the mediation, a licensed Spanish language interpreter facilitated these discussions. In subsequent meetings, Rapaport Law Firm's Spanish-speaking staff interpreted. As such, Plaintiffs' counsel is confident that all of the Plaintiffs fully understand, and voluntarily consent to, the apportionment of the settlement amount. Furthermore, during the mediation, and afterward, Plaintiffs' counsel explained to Plaintiffs that they had the option of continuing to litigate their respective claims.

## VI. The Agreement is Fair and Reasonable.

The parties represent to the Court that the settlement between the parties is a voluntary, fair, and reasonable resolution of a *bona fide* dispute reached as a result of a mediation session with an experienced mediator. The Agreement is the product of challenging negotiations that lasted a full day.

As reflected in the attached Agreement, the parties have agreed to settle the case with a payment to Plaintiffs (inclusive of legal fees and costs) totaling $451,500.00. After attorneys' fees and costs, Plaintiffs receive payments totaling $295,780.66. The settlement amount is fair and reasonable in light of the uncertainties that Plaintiffs face, including the challenge of establishing the number of hours they worked. *See Beckert v. Rubinov*, 15 Civ. 1951 (PAE), 2015 WL 8773460, at *2 (S.D.N.Y. Dec. 14, 2015) (finding that the "amount [plaintiff] would receive under the Agreement ($29,557.97) is a substantial proportion of the maximum possible recovery he identifies ($114,700)"). There are also challenges and uncertainties associated with establishing that Defendants were aware that Ms. Liz was working for Defendants at 300/304 East 162nd Street in the Bronx. We also believe the settlement amount is fair because it takes into account the risk that the other Plaintiffs' overtime claims may fail as a result of the janitor exemption.

The parties engaged in formal document discovery and exchanged interrogatories, but we were able to avoid the significant costs of an aggressive schedule of well over a dozen depositions of parties and non-parties. We were also able to avoid the significant costs of further motion practice and trial. *See Burgos v. San Miguel Transp., Inc.*, 2016 U.S. Dist. LEXIS 166248, *6, 2016 WL 7015760 (S.D.N.Y. Dec. 1, 2016) (citing the relatively early stage of the case as one of the factors supporting the fairness of a settlement that was substantially below the amount that plaintiff initially contemplated). Furthermore, here, as in *Burgos*, there is no assurance that Plaintiffs could be awarded liquidated damages under FLSA or NYLL if this matter were to proceed to trial.

We believe that the allocation of the proceeds among the Plaintiffs, as described in detail above, is fair because of the risks associated with each of their cases. In particular, Ms. Liz faces a significant hurdle in proving that Defendants employed her. If a trier of fact determines that Ms. Liz did not have the status of Defendants' employee, her claim would completely fail. In contrast, even if the other Plaintiffs' NYLL claims fail due to the janitor exemption, their FLSA claims would survive. As previously mentioned, the Plaintiffs have all discussed and agreed to the allocation.

The non-monetary provisions of the Agreement do not run afoul of *Cheeks*. The Agreement does not contain a confidentiality clause, no re-hire provision or a non-disparagement provision. As to Blanco, the Agreement contains a mutual general release with PMG because Blanco had potential claims in addition to those for overtime. Blanco had a potential claim against PMG for retaliation and also potential claims to continue to occupy the superintendent apartment provided to him by PMG. However, PMG also had potential claims against Blanco based on his conduct outlined above. Blanco received an additional $6,500.00 to release these additional claims; PMG agreed to also provide him with a general release. *See Delijanin v. Wolfgang's Steakhouse Inc.*, No. 18-cv-7854, 2021 WL 535635 *5 (S.D.N.Y. Feb 12, 2021) (courts approve general release where claims extend beyond wage and hour).

As to all Plaintiffs other than Blanco, the release is narrowly tailored to the wage and hour claims they could have asserted in this litigation.

### VII. Application for Attorneys' Fees.

Under both the FLSA and NYLL, Plaintiffs are entitled to recover attorneys' fees and costs. Attorneys' fees in FLSA settlements are examined to ensure that the interests of plaintiffs' counsel in his or her own compensation did not have an adverse impact on the extent of relief counsel obtained for the client. *See Wolinsky v. Scholastic*, 900 F.Supp.2d 332, 336 (S.D.N.Y. 2012).

Plaintiffs' counsel is seeking $155,719.34 in combined disbursements and legal fees ($10,036.33 for disbursements, and $145,683.01 in legal fees). This represents a contingent legal fee of 33% of the net value of settlement ($451,500.00 - $10,036.33 = $441,463.67 x 33%). This percentage is the amount of the contingency fee provided by Plaintiffs' retainer agreement with counsel (Exhibit 3), which provides for legal fees of 33% of the net recovery.

Rapaport Law requests reimbursement for costs/disbursements in the amount $8,128.58, which is largely attributable to filing fees and costs for service of process and an interpreter at both the court-ordered mediation and the private mediation. Proof of the foregoing costs/disbursements is set forth in Exhibit 4 hereto. Miller Law, PLLC ("Miller Law") requests reimbursement of $1,907.75, which mostly reflects the fees paid to JAMS in connection with the private mediation and the cost of translating the settlement agreement to Spanish. Proof of the foregoing costs/disbursements is set forth in Exhibit 5 hereto. All of these expenses were reasonable and necessary for the prosecution of Plaintiffs' claims.

Contingency fees of one-third are routinely approved in this Circuit. *Sierra v. Mid City Gym and Tanning LLC*, No. 16 Civ. 2892, 2017 WL 4862070 *4 (S.D.N.Y. Oct. 25, 2017); *Gaspar v. Personal Touch Moving, Inc.*, No. 13 Civ. 8187, 2015 WL 7871036 *2 (S.D.N.Y. Dec. 3, 2015).

The percentage method is the preferred method in this Circuit; however, the lodestar method is used as a "cross-check" to ensure that the amount is not unreasonable. *Chen*, 2021 U.S. Dist. LEXIS 189942 *17-18 (citing *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000) and *Beckman v. Keybank*, N.A., 293 F.R.D. 467, 481-82 (S.D.N.Y. 2013) (granting attorneys' fees where award was 6.3x the lodestar amount)).

Rapaport Law's time spent on this matter and the expenses reasonably incurred are set forth in the accurate, detailed and contemporaneous records attached hereto as Exhibit 6. Similarly, Exhibit 7 is the history bill of Miller Law.[4] This case was contentious and often complicated by the need to negotiate with two competing factions of Defendants. Plaintiffs' counsel prepared for and attended two mediation sessions, engaged in extensive motion practice and prepared and responded to significant discovery demands.

Our hourly rates set forth in the attached history bills are consistent with the rates that have been approved by courts in the Southern and Eastern Districts in similar FLSA cases (including in cases handled by Rapaport Law and Miller Law). The attached history bills show a combined, total lodestar of $177,893.67, which is more than the $145,683.01 in requested legal fees. Courts have approved fees that exceed and even double the lodestar, which is not the case here because the requested fees are only approximately 82% of the lodestar. *See Castillo v. Cranes Express, Inc.*, No. 18-cv-1271, 2018 WL 7681356 *5 (E.D.N.Y. Dec. 12, 2018) (approving one-third contingency fee that was 1.26 lodestar multiplier); *see also Munecas v. Bold Food, LLC,* No. 09 Civ. 00440 (DAB), 2010 WL 3322580, at *10 (S.D.N.Y. Aug. 23, 2010) ("Courts regularly award lodestar multipliers from 2 to 6 times lodestar."); *Sakiko Fukiwara v. Sushi Yasuda Ltd*, 58 F. Supp. 3d 424, 439 (S.D.N.Y. 2014) ("[A] multiplier near 2 should, in most cases, be sufficient compensation for the risk associated with contingent fees in FLSA cases.").

The lodestar reflects a billing rate of $450/hr for attorneys Meredith R. Miller (Miller Law) and Marc Rapaport (Rapaport Law); $115/hr for Karina Gulfo and Marcela Cabezas, paralegals at Rapaport Law; and $95/hr for Joselin Orellana, a legal assistant at Rapaport Law. These hourly rates for attorneys have been held to be reasonable for experienced counsel in the Eastern District of New York. *See Ramirez v. Addy Hospitality LLC*, No. 21-cv-3768, 2022 WL 10077760 (E.D.N.Y. Oct. 17, 2022) (approving rate of $450/hr for experienced counsel); *Pernal v. Proflame Inc.*, No. 21-cv-4526, 2022 WL 16636689 (E.D.N.Y. Nov. 2, 2022) (accord); *Almond v. PJ Far Rockaway, Inc.*, No. 15-cv-6792, 2018 WL 922184 (E.D.N.Y. Feb 15, 2018) (accord).

The attorneys and staff at Rapaport Law and Miller Law who were involved in this case, and whose time is reflected in the attached billing records, are:

1. **Marc Rapaport**

Mr. Rapaport received a J.D. from Georgetown University Law Center in 1992. Thereafter, he worked as a Staff Attorney for the United States Department of Justice (Foreign Claims Settlement Commission) in Washington, D.C.

In 1995, Mr. Rapaport founded Rapaport Law. He has more than twenty-five years of experience litigating employment matters on behalf of employees in New York. He represents employees in a broad range of discrimination and wage/hour matters. He is an active member of the National Employment Lawyers Association and the National Employment Lawyers Association New York. Mr. Rapaport's clients also benefit from his broader litigation

---

[4] The fact that the requested attorneys' fees are split between Rapaport Law and Miller Law does not affect the amount of fees requested. Plaintiffs' counsel worked jointly on this case, as they have on dozens of other cases for more than fifteen years. The total amount of fees requested remains 33%.

experience beyond the field of employment law, including his experience litigating commercial disputes in state and federal courts.

For more than 25 years, he has represented immigrant workers who often find it difficult to obtain skilled legal representation. In recent years, he has particularly focused on representing immigrant workers in the building service and construction industries, which have included, by way of example, the following matters: *Armas et al. v. SKYC Management LLC et al.*, SDNY 2014 CV 6360 (PGG)(HBP); *Castillo et al. v.140 Ash Associates, LLC, et al.*, EDNY 16-cv-5216 (FB)(PK); *Salas et al. v. Phoenix ACV Construction Services, LLC et al.*, SDNY 16-cv-08066; *Pichardo v. United Chelsea, LLC, et al.*, 20-cv-04706 (GHW); *Acosta v. Superior One Management Corp., et al.*, SDNY Case No. 21-cv-1163 (JMF)(RWL).

Recently, in the matter *Contrera, et al. v. Langer, et al,* SDNY, 16-cv-3851*,* Mr. Rapaport and I served as co-counsel and reached a substantial overtime settlement on behalf of a class of over 600 building superintendents, porters and handymen.

2. **Meredith R. Miller**

I have served as Of Counsel to Rapaport Law for almost twenty years. I received a J.D. from Brooklyn Law School in 2000. Thereafter, I started my legal career in Albany, clerking for the New York Court of Appeals. I then served as a litigation associate at Proskauer Rose, LLP in New York City. In 2004, I accepted a teaching fellowship at Temple Law School in Philadelphia, which began my career as a law professor. Since 2006, I have taught contracts, business and employment law at the Touro University, Jacob D. Fuchsberg Law Center in Long Island, New York. I have written and lectured extensively on these subjects. Additionally, I have served as co-counsel with Mr. Rapaport on well over a dozen wage cases representing immigrant and low-wage workers.

3. **Karina Gulfo**

Ms. Gulfo has been a paralegal at Rapaport Law since August 2018. She graduated from John Jay College of Criminal Justice in 2021 and is now pursuing a graduate degree. Prior to joining the firm, Ms. Gulfo worked as a legal assistant for a civil rights and criminal defense law firm in the Bronx for four years.

Ms. Gulfo speaks fluent Spanish. Because of her language skills, Ms. Gulfo served a crucial and effective role in our representation of Plaintiffs. Ms. Gulfo has performed FLSA damage calculations in multiple FLSA/NYLL cases since she joined Rapaport Law. A substantial portion of Ms. Gulfo's responsibilities involve client communications, damages analysis, and case management in FLSA matters. Ms. Gulfo is a primary point of contact for the firm's clients.

4. **Marcela Cabezas**

Ms. Cabezas has been a paralegal at Rapaport Law Firm since 1998. Ms. Cabezas graduated from New York Institute of Technology with a B.S., and she also has a certificate

from the New York Paralegal School. Ms. Cabezas speaks fluent Spanish. Because of her language skills and extensive experience providing paralegal support in wage and employment cases, Ms. Cabezas plays a crucial and effective role in our firm's representation of immigrant workers. For nearly two decades, she has served as a point of contact for our firm's Spanish-speaking clients. Ms. Cabezas has been closely involved in handling fact-development, client communications, and damages analysis in at least two dozen wage and hour matters. In this matter, Ms. Cabezas was particularly involved in client communications and deposition preparation for the Blanco deposition.

5. **Joselin Orellana**

Joselin Orellana has been a legal assistant with Rapaport since March 2020. Ms. Orellana speaks fluent Spanish. She is particularly experienced in performing damage calculations in FLSA/NYLL cases. Ms. Orellana is currently an undergraduate student at the City University of New York, Baruch College. In this case, Ms. Orellana took a lead role in calculating damages and preparing Plaintiffs' damages chart. Ms. Orellana was also extensively involved in researching the extent of Defendants' real estate holdings/enterprise, which entailed a review of public records of multiple agencies.

\* \* \*

We respectfully request that the Court approve the Agreement, as well as the amount of legal fees requested herein. Should Your Honor have any questions or concerns regarding this settlement, the parties are happy to discuss them. The parties thank the Court for its attention to this matter.

Respectfully yours,

Meredith R. Miller

Encls. (Exhibits 1 – 7)


cc: All Counsel of Record (*Via ECF only*)